MURRAY, Judge.
 

 |, This is a sales tax case. In an earlier decision, this court found the transactions
 
 *664
 
 at issue were taxable barters between Production Operators, Inc. (“POI”) and its customers and remanded for a determination of the sales price on which the sales taxes due could be calculated.
 
 Bridges v. Production Operators, Inc.,
 
 07-0648 (La. App. 4 Cir. 12/12/07), 974 So.2d 54
 
 (Bridges I).
 
 On remand, the trial court determined that “[u]nder the unique facts of these transactions, there is simply no sale price that is subject to taxation.” From this decision, the Louisiana Department of Revenue (the “Department”) appeals. For the reasons that follow, we affirm.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 This sales tax dispute arises out of the Department’s audit of POI for the tax period January 1, 1997, through December 31, 1999. During the tax period, POI was a provider of natural gas compression services to companies engaged in the exploration and production of natural resources in Louisiana. POI’s services were provided pursuant to a standard gas compression contract with its customers. | ¡/Under the contract, the customer was required to provide compressor fuel (fuel gas) at no cost to POI. Following the audit, the Department determined that POI owed additional taxes on the customer-supplied compressor fuel. On September 28, 2000, the Department issued a proposed assessment of $129,652.96 in taxes and interest, which POI refused to pay.
 

 On December 20, 2001, the Department filed this suit against POI seeking to recover taxes, interest, and attorney’s fees pursuant to La. R.S. 47:1561(3). POI answered the suit and filed a motion for summary judgment seeking an order that the Department vacate its assessment. The trial court granted POI’s motion and rendered judgment ordering the Department to vacate its assessment. In
 
 Bridges I, supra.,
 
 this court reversed and remanded for a determination of the sales price on which the sales taxes due could be calculated.
 

 On February 3, 2010, a trial was held at which three witnesses testified.
 
 [1]
 
 To provide a background for deciding the factual issue presented on this appeal, we summarize the testimony of the three witnesses.
 

 1. Arthur Champ
 

 Arthur Champ, a revenue tax auditor specialist, was the Department’s only witness. Mr. Champ testified that the Department assessed tax liability on the cost of POI’s taxable use of natural gas in Louisiana.
 
 [2]
 
 He acknowledged that the compressor fuel at issue was neither metered nor measured and that the | .^Department relied on theoretical calculations to determine the amount of compressor fuel POI used.
 
 [3]
 
 He explained that the
 
 *665
 
 Department valued the compressor fuel using the spot market rate, which it calculated based on the Henry Hub market rate. He further explained that the Henry-Hub market rate is the rate used to value commercial quality gas — the type used in businesses and residences — and that the compressor fuel at issue is a lower quality gas.
 
 [4]
 

 2. Kirk Townsend
 

 Kirk Townsend, a retired former employee and president of Exterran Company, testified on POI’s behalf. Mr. Townsend testified that he worked in the gas compression industry for thirty years. According to Mr. Townsend, Exterran (his former employer) acquired ownership of POI in 2000. He testified that he was familiar with POPs operations during the tax period (1997 to 1999). He explained that the service POI (and Exterran) provides is moving “stranded gas” — gas that will not flow on its own from point A to point B without being compressed. He further explained that the service generally is provided in very 14remote (or offshore) locations where no other power source (gas or electricity) is available.
 

 Mr. Townsend identified a copy of POI’s standard contract, which he characterized as a typical boilerplate contract used in the industry. He testified that under the terms of the contract the customer is required to provide compressor fuel at no cost to POI; thus, “POI pays nothing to its customers for fuel gas [compressor fuel].” Mr. Townsend also characterized the contract as a negotiated, arms-length one. He indicated that in negotiating the contract only two things are mentioned regarding compressor fuel: its pressure— compressor fuel must have an adequate pressure to run the engine — and the content of any poisons in it.
 

 Mr. Townsend testified that POI bills its customer a flat monthly fee for its service. He identified two invoices as representative samples of POI’s monthly billing invoices during the tax period. He testified that compressor fuel plays no role in calculating the amount of the flat monthly fee and that the fee is not adjusted for the amount of compressor fuel POI uses. He noted that neither POI nor its customer (the producer) keeps track of, measures, or meters the amount of compressor fuel POI uses. Mr. Townsend testified that “[t]here’s no accounting entry or ledger that says we [POI] used this much this month.”
 

 In terms of economics, Mr. Townsend explained that the producer allows POI to use the compressor fuel at no cost because “it’s the most economical way for us to operate the piece of equipment.” Mr. Townsend characterized the quality of the compressor fuel as “minimally cleaned fuel gas” coming straight out of the | swell that could not be used in a business or residence. When asked about the concept that “businesses don’t give things away for free” and whether it applies in this particular factual scenario, Mr. Townsend replied “[n]ot at all.” He noted that worldwide in the industry it is understood that
 
 *666
 
 in this type of business relationship compressor fuel is provided to the compression company at no cost.
 

 Answering the question of what would occur if the producer required POI to pay for the compressor fuel, Mr. Townsend replied that POI would, in turn, charge the producer the same amount as the producer charged it. He emphasized that “it’s a zero sum for us because we don’t get a benefit from it.” Stated otherwise, he testified that “if he [the producer] says, I’m going to charge you for using my fuel gas [compressor fuel], I’m going to charge him the same amount probably, plus some sort of handling fee for the gas that he’s charging me for.”
 

 On cross-examination, Mr. Townsend testified that it would be uneconomical for POI to purchase a fuel source from a third party to run its compressors. He explained that bringing fuel in from another source would be completely uneconomical because POI provides its service at very remote locations. Indeed, he noted that this has never happened. As to whether it is possible, he replied “anything is possible, but it’s completely uneconomical.” On redirect, Mr. Townsend explained that “[i]f I had to do that, my fee would be huge.” He indicated that he absolutely would charge the fuel costs back to the customer, and the customer would most likely lose money on the whole deal because that would be “very cost prohibitive.”
 

 | (iff.
 
 Lesa Adair
 

 Lesa Adair, who also testified on POI’s behalf, was qualified as an expert in natural gas operations and valuation. Ms. Adair explained that gas typically is metered for the first time when it leaves the lease — at the facility line. She further explained that the facility line is the key place from an accounting perspective to meter the gas because it is the point where royalty owners get paid and severance taxes get collected. She noted that the problem with metering the gas before that point (at the wellhead) is that there is “gas and liquid together, and if you try to meter that, you just get garbage coming out of the meter reading, because it doesn’t know whether it’s looking at gas or liquid, and so it doesn’t know how to account for it.”
 

 Ms. Adair corroborated Mr. Townsend’s testimony regarding the standard contract used by compression companies, like POI. She testified that the contract typically provides that “some gas needs to be consumed on the lease for the minerals to be produced in the first place” and that the compressor fuel is to be provided at no cost. Indeed, she noted that providing compressor fuel at no cost is “an accepted practice in the industry.” She indicated that the reason the producer allows the compression company to use the compressor fuel at no cost is because it is part of the cost of doing business.
 

 Ms. Adair testified that the compressor fuel at issue is not commercial market quality gas and that there is no market for compressor fuel on the lease. In 17contrast, she described the Henry Hub as a unique location — delivery point — in the United States at which there is a huge market for commercial quality gas.
 

 Addressing the hypothetical question of what would occur if the industry practice of allowing the compression company to use compressor fuel at no cost was changed, Ms. Adair testified that the economics of the deal likewise would change “[b]ecause POI would then be subject to gas price risk or commodity price risk that’s not part of their business offering today.” She noted that, at a minimum, there would be some type of “charge back mechanism to the producer, and they would have to negotiate how they would handle that.” She echoed Mr. Townsend’s
 
 *667
 
 testimony that the result would probably be a zero sum “because the third party compression operator is not going to absorb that fuel cost.”
 

 Assuming POI would have to pay for the compressor fuel (and would charge it back to the customer), Ms. Adair testified that the value of the compressor fuel “would be negotiated between the parties.” She testified that if the producer would charge the compression company for the compressor gas, the producer would not charge the commercial market value; rather, the producer probably would charge the cost of actually producing the gas at the well and delivering it to the compressor. Based on the Energy Information Administration (a part of the Department of Energy) data for the tax period, Ms. Adair determined that the cost to produce at the well in Louisiana during the tax period was in the “32 to 33 cent per MCF range.”
 
 [5]
 

 | RBased on her experience, Ms. Adair reiterated that the producer typically does not charge anything to a compression company, like POI, for the compressor fuel. She testified: “It’s not accounted for. There’s no invoices for it. It’s not charged for at all.”
 

 As noted earlier, the trial court, based on the evidence presented at trial, made a factual finding that under the unique facts of these transactions no sales tax is due. In accord with that finding, the trial court on February 24, 2010, rendered a judgment dismissing the Department’s petition with prejudice. On that same date, the trial court also issued written reasons for judgment stating:
 

 This Court is called upon to determine how much, if any, sales tax is owed by Production Operators, Inc. (POI) to the State. After hearing all of the testimony, it is this Court’s conclusion that no sales tax is due. Under the unique facts of these transactions, there is simply no sales price that is subject to taxation.
 

 From this judgment, the Department appeals.
 

 DISCUSSION
 

 In reviewing the factual findings of a trial court, an appellate court is limited to a determination of whether those findings are manifestly erroneous.
 
 Stobart v. State Through Dep’t of Transp. and Dev.,
 
 617 So.2d 880, 882 (La.1993). Under the manifest error rule, an appellate court must give great weight to the trial court’s factual conclusions, and “where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.” Id.(citing
 
 Canter v. Koehring Co.,
 
 283 So.2d 716, 724 (La.1973)). Stated otherwise, “where there is conflict in the testimony, reasonable evaluations | flof credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.”
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989).
 

 The sole issue presented on this appeal is whether the trial court’s factual finding that under the unique facts of these transactions there was no sales price is manifestly erroneous. The term sales price is defined by statute as “the total amount for which tangible personal property is sold ... including any services, except services for financing, that are a part of the sale valued in money, whether paid in money or otherwise.” La. R.S. 47:301(13)(a).
 
 [6]
 

 The Department contends that the trial court erred in concluding that the sales price (value) of the compressor fuel is zero.
 
 *668
 
 The Department contends that if POI had to purchase a fuel source from a third party, it would have done so at the spot market rate. The Department further contends that POI has not suggested any alternative valuation methodology. According to the Department, using the spot market rate to impute a sale price to the barter transactions at issue therefore is reasonable.
 

 POI counters that the record supports the trial court’s factual finding that no amount was paid by POI, in any form, for the compressor fuel and thus that there is l10no sales price. According to POI, the evidence presented at trial regarding the sales price — the amount, if any, it paid for the compressor fuel — is as follows:
 

 • Under its contract with its customers, POI provided compression services to producers in the oil and gas industry;
 

 • POI provided the equipment and personnel necessary to operate and maintain the compressor at the customer’s jobsite;
 

 • The customers’ jobsites were typically in remote areas or offshore;
 

 • The customers provided “at no cost to POI” fuel gas [compressor fuel] to operate the compressors;
 

 • POI invoiced its customers a monthly charge for its services;
 

 • POI’s use of the fuel gas [compressor fuel] was not negotiated between the parties;
 

 • Neither POI nor its customers kept track of the amount of fuel gas [compressor fuel] used and did not associate any value with it for purposes of their contracts;
 

 • The fuel gas [compressor fuel] provided to POI had not been processed and contained contaminants, including dust, liquids and sand, and did not meet the necessary specifications for use in commercial or residential settings; and
 

 • There is no market for the fuel gas [compressor fuel] where it is provided to POI.
 

 POI thus contends that the trial court’s finding that there is no sales price is not manifestly erroneous and should be affirmed. We agree.
 

 In
 
 Bridges I, supra,
 
 this court held that the transactions between POI and its customers were taxable sales — barters. In so holding, we observed that POI received consideration from its customers in the form of compressor fuel. Addressing the consideration, we noted:
 

 [T]he consideration that POI received in exchange for its compression services included not only the flat monthly fee but also the fuel |1Tnecessary for this process. We are persuaded by the Board’s argument that had its customers not provided the gas mixture to power its compressors, POI would have been required to obtain the fuel for the compressors from an outside source, incurring additional expense. It can be inferred that POI factored this saving into the calculation of its monthly rate.
 

 Bridges I,
 
 07-0648, pp. 11-12, 974 So.2d at 61-62. Given the procedural posture of the case (a reversal of a summary judgment in the taxpayer’s favor), we expressly declined to reach the factual issue of the
 
 *669
 
 amount of the consideration. ■
 
 Bridges I,
 
 07-0648, p. 12, n. 11, 974 So.2d at 62. Rather, we remanded for the trial court to take evidence on the issue and to make the factual determination.
 
 Id.
 

 At the trial on remand, the evidence presented established that POI did not factor the compressor fuel cost savings into the calculation of its monthly rate. Rather, the evidence established that the parties did not consider the compressor fuel savings in their contract negotiations. The evidence further established that the monthly rate POI charged its customers was a flat fee, which did not vary based on the amount of compressor fuel POI used. The evidence still further established the lack of a market for the compressor fuel where it was provided to POI. Given the lack of a market for the compressor fuel, the Department’s reliance on the spot market rate to impute a sales price for it was misplaced. Moreover, POI’s witnesses testified that if its customers had charged it for the compressor fuel (or if it had to acquire such fuel from another source),
 
 [7]
 
 POI would have passed that cost along to its customers; and the result would have been a zero sum.
 

 11?Based on the evidence presented at trial, we cannot conclude that the trial court was manifestly erroneous in finding under the unique facts of these transactions there is no sales price and thus no taxes owed.
 

 DECREE
 

 For the foregoing reasons, the judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . The parties also introduced various exhibits, including a sample gas compression contract and two sample invoices.
 

 [2]
 

 . Although the Department’s witness refers to a taxable use, it is undisputed that this case involves only a claim for sales taxes.
 
 Bridges I,
 
 07-0648, p. 1, n. 1, 974 So.2d at 55.
 

 [3]
 

 . The basis for the theoretical calculations was data that POI’s engineering staff provided to the Department. As we noted in
 
 Bridges I, supra:
 

 At the request of the auditor, POI was able to provide a listing by compressor unit of the fuel used for each year and the engine specifications for several compressor engines to explain how it calculated the fuel used. The reports compiled by POI's engineering and operations departments were included as schedules as part of the Department’s audit report. The information about the quality of gas utilized, horsepower capacity of the engines and operating time of the engines used by POI were taken into account by its engineering and operations
 
 *665
 
 departments in compiling the reports, which identified the compressor fuel utilized. This information was also included in the audit.
 

 07-0648, p. 4, 974 So.2d at 57.
 

 [4]
 

 . Mr. Champ testified that to account for the compressor fuel being a lower quality gas the Department recently went back and reduced the rate it used to value the compressor fuel at issue. He explained that the Department took the lowest monthly average of four different gas markets on a monthly basis and reduced that figure by an additional fifteen percent. However, he acknowledged that this reduction was not reflected in any of the documents that were introduced at trial.
 

 [5]
 

 . In the oil and gas industry, mcf refers to 1,000 cubic feet.
 

 [6]
 

 . The sales tax is levied upon the sales price of each item or article of tangible personal property when the property is sold at retail in
 
 *668
 
 Louisiana. La. R.S. 47:302(A). The amount of the sales tax is calculated based on the sales price. In contrast, the use tax is calculated based on "the cost price of each item or article of tangible personal property that has not been sold, but rather has been used, consumed, distributed or stored for use or consumption in Louisiana.” Bruce J. Oreck,
 
 Louisiana Sales & Use Taxation,
 
 § 2.9 (2d ed.1996). "Cost price is the lesser of (1) the actual cost of the property subject to the tax ... or (2) the reasonable market value of the tangible personal property at the time it becomes susceptible to the use tax.”
 
 Id,
 

 [7]
 

 . POI's witness, Mr. Townsend, testified that it was impractical and uneconomical for POI to acquire compressor fuel from another source.